ASJZ: USAO#2020R00756

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

USDC- BALTIMORE
'22 JUN 23 PM2:51

| | |
|---|---|
| **UNITED STATES OF AMERICA** | * |
| | *    **CRIMINAL NO.** CCB-22-224 |
| **v.** | * |
| | *    **(Wire Fraud, 18 U.S.C. § 1343; Money** |
| **DANA LAMAR ANTONIO HAYES,** | *    **Laundering, 18 U.S.C. § 1957;** |
| **JR.,** | *    **Aggravated Identity Theft, 18 U.S.C.** |
| | *    **§ 1028A; Forfeiture, 18 U.S.C. §§ 981** |
| **Defendant** | *    **and 982, 21 U.S.C. § 853(p), and 28 U.S.C.** |
| | *    **§ 2461(c))** |
| | * |

\*\*\*\*\*

### INDICTMENT

### COUNTS 1-5
### (Wire Fraud)

The Grand Jury for the District of Maryland charges that:

At all times relevant to this Indictment:

### Relevant Individuals and Entities

1.      Defendant **DANA LAMAR ANTONIO HAYES, JR.** ("**HAYES**") was a resident of Maryland.

2.      In or about November 2015, **HAYES** incorporated D&L Investment Properties Inc. ("D&L") in the State of Maryland. On the 2019 Schedule K-1 Form 1065 filed with the IRS for D&L, **HAYES** listed himself and his mother as equal fifty percent owners of the company. **HAYES** forfeited D&L's incorporation on or about October 11, 2019. **HAYES** subsequently revived D&L on or about April 27, 2020.

3.      The Maryland Department of Labor has no wage records on file records for D&L. According to federal tax records filed by **HAYES** on behalf of D&L, D&L has never employed

any individuals, nor has D&L ever issued a Form 1099-MISC to any individual.

### The Paycheck Protection Program

4.      The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.  One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").  In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

5.      In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application, which was signed by an authorized representative of the business.  The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.  In the PPP loan application, the small business (through its authorized representative) was required to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees.  These figures were used to calculate the amount of money the small business is eligible to receive under the PPP.

6.      A PPP loan application was required to be processed by a participating lender, such as a financial institution.  If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which were 100% guaranteed by the Small Business Administration ("SBA").  Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

2

7.      PPP loan proceeds were required to be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities.   The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time and used a certain percentage of the PPP loan proceeds on payroll expenses.

### The Economic Injury Disaster Relief Program

8.      The Economic Injury Disaster Loan ("EIDL") program was an SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

9.      Through the CARES Act, the SBA was authorized to provide EIDLs to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic. In addition, the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses within three days of applying for an EIDL.   The amount of the advance was determined by the number of employees the applicant certified having.   The advances did not have to be repaid.

10.      In order to obtain an EIDL and advance, a qualifying business was required to submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster.   In the case of EIDLs for COVID-19 relief, the 12-month period was that preceding January 31, 2020.   The applicant was required to also certify that all the information in the application was true and correct to the best of the applicant's knowledge.

3

11.     EIDL applications were submitted directly to the SBA and processed by the agency with support from a government contractor.   The amount of the loan, if the application was approved, was determined based, in part, on the information provided by the application about employment, revenue, and cost of goods, as described above.   Any funds issued under an EIDL or advance were issued directly by the SBA.   EIDL funds could be used for working capital for fixed debts, payroll expenses, accounts payable, and other bills resulting from the pandemic.   If the applicant also obtained a loan under the PPP, the EIDL funds could not be used for the same purpose as the PPP funds.

## **Relevant Financial Institutions**

12.     Bank 1 was an SBA-authorized PPP lender headquartered in Atlanta, Georgia.   At all times relevant to this indictment, Bank 1 participated as a lender in the PPP.

13.     Bank 2 was an SBA-authorized PPP lender headquartered in Fort Lee, New Jersey. At all times relevant to this indictment, Bank 2 participated as a lender in the PPP.

14.     Borrowers applied for PPP loans online through Bank 1's and Bank 2's websites by creating an account. Borrowers were then able to enter information pertinent to the PPP loan application, including but not limited to payroll costs and number of employees.   Borrowers also uploaded supporting documentation and signed loan documents electronically through the account.   Once a loan was approved, it would be funded by the respective Bank.

4

## The Scheme to Defraud

15.     Between in or around March 2020 and continuing until in or around April 2022, **HAYES** devised and intended to devise a scheme to defraud the SBA, Bank 1, and Bank 2, and to obtain money and property from the SBA, Bank 1, and Bank 2 by means of materially false and fraudulent pretenses, representations, promises, and material omissions, with intent to defraud and with knowledge of the scheme's fraudulent nature ("the scheme to defraud").

### Purpose of the Scheme to Defraud

16.     It was the purpose of the scheme to defraud for **HAYES** to unjustly enrich himself by fraudulently obtaining or attempting to obtain PPP and EIDL loan proceeds.

### Manner and Means of the Scheme to Defraud

It was part of the scheme to defraud that:

17.     From in and around March 2020 to in and around September 2021, **HAYES** submitted and caused to be submitted to the SBA an EIDL loan application and supporting materials on behalf of D&L.   The loan application contained false and fraudulent statements, including false statements regarding the number of employees and payroll expenses at the entities. On the basis of the materially false and fraudulent statements in the EIDL loan application, **HAYES** caused the SBA to approve and fund an EIDL loan in the name of D&L.

18.     From in and around June 2020 through March 2021, **HAYES** submitted and caused to be submitted to Banks 1 and 2 PPP loan applications on behalf of D&L.   In the PPP loan applications, **HAYES** made and caused to be made false and fraudulent statements, including false statements regarding the number of employees and payroll expenses of the entities.   In addition, in support of the PPP loan applications, **HAYES** submitted and caused to be submitted falsified documentation, including fraudulent tax forms.   On the basis of the materially false and

fraudulent statements in the PPP loan applications and supporting documentation, **HAYES** caused Banks 1 and 2 to each approve and fund a PPP loan in the name of D&L.

Fraudulent EIDL Loan

19.     On or about December 18, 2018, **HAYES** was arrested in Baltimore City for possession of a stolen firearm, a Glock pistol.

20.     On or about April 30, 2019, **HAYES** was placed on probation for the firearm offense. **HAYES** began monthly reporting to the Maryland Department of Public Safety and Correctional Services Probation Office ("Maryland Probation").

21.     On or about March 26, 2020, Maryland Probation called **HAYES** and told him not to report in person on March 27, 2020, because of the COVID pandemic. **HAYES** was instructed that the telephone calls would suffice for his regularly scheduled monthly probation appointment. **HAYES** was directed to contact Maryland Probation by telephone for his next monthly appointment in April.

22.     On or about March 31, 2020, **HAYES** applied online for an EIDL loan on behalf of D&L.   As part of the loan application, **HAYES** stated that he was the CEO and 80% owner of D&L, and that D&L had 3 employees as of January 31, 2020.

23.     The application also asked: "For any criminal offense . . . have you ever been convicted, plead guilty, plead nolo contendere, been placed on pretrial diversion, or been placed on any form of parole or probation (including probation before judgment)?"   **HAYES** answered, "no."

24.     **HAYES** also checked a box indicating "I would like to be considered for an advance of up to $10,000."

6

25.     The application contained a statement: "CERTIFICATION AS TO TRUTHFUL INFORMATION: By signing this application, you certify that all information in your application and submitted with your application is true and correct to the best of your knowledge, and that you will submit truthful information in the future."

26.     The application further stated: "WARNING . . . [A]ny false statement or misrepresentations to the SBA may result in criminal, civil, or administrative sanctions including, but not limited to: 1) fines and imprisonment, or both under 15 U.S.C. 645, 18 U.S.C. § 1001, 18 U.S.C. § 1014, 18 U.S.C. § 3571, and or any other applicable laws." **HAYES**'s application was denied.

27.     For the next approximately eighteen months, **HAYES** regularly contacted the SBA in attempt to have his EIDL application granted after it had been initially declined.   For example, on May 29, 2020, **HAYES** wrote a letter to the SBA identifying himself as the CFO of D&L, and stated that he "disagreed with the decision of denial" of the EIDL application. In support of reconsideration of the EIDL application, **HAYES** stated that, "My salaries a month is 5,000 . . . my expenses are salaries of 15,000, equipment and supplies of 35,000 . . . Please take my application under reconsideration as I made these errors under a panicking state of mind. COVID-19 has really affected my business and my errors have put my employees and their families lives in financial danger."   Contrary to this statement, as stated above, federal and state records indicate that D&L never had any employees.

28.     In or about September 2021, D&L's EIDL application was granted and two deposits were made into D&L's bank account totaling $15,000.   **HAYES** immediately transferred all of the EIDL funds from D&L's bank account to his personal savings account.

Fraudulent First Draw PPP Loan (June 2020)

29.     On or about June 2, 2020, **HAYES** called Maryland Probation for his regular reporting. **HAYES** told probation that he was currently employed at Company 1, where he had been promoted to a supervisor.   **HAYES** was instructed to call Maryland probation to check in the following month.

30.     On or about June 22, 2020, **HAYES** applied for a $12,500 PPP loan with Bank 1 on behalf of "D&L Investmetn" [sic] using the Employer Identification Number (EIN) for D&L and his home address.   As part of the application, **HAYES** filled out a borrower application form that listed himself as the "CFO" of D&L.   **HAYES** also attached an IRS Schedule K-1 listing himself as a 50% owner of D&L.

31.     The PPP loan application contained eight questions.   Written above Questions 5 and 6, underlined and in italics, was the statement: "*If questions (5) or (6) answered "Yes," the loan will not be approved.*"

32.     Question 5 stated: "Is the Applicant (if an individual) or any individual owning 20% or more of the equity of the Applicant subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction, or presently incarcerated, or on probation or parole?"

33.     **HAYES** checked the answer box for Question 5 "no" and initialed confirming his response. In truth and **HAYES** was on probation at the time he answered the question.

34.     On the application **HAYES** stated that D&L had four employees with an average monthly payroll of $5,000. **HAYES** also attached an IRS Form W-3 to the application purporting to show that D&L had paid $60,000 in wages in tax year 2019.   That Form W-3 was fraudulent and never filed with the government.

35.     **HAYES** also certified that: "The Applicant was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC."   **HAYES** certified by placing his initials next to the statement. As described above, federal and state records show that D&L never paid any individual a salary, nor did D&L ever file any Form 1099-MISCs with the IRS.

36.     **HAYES** further certified that "the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from the SBA is punishable under law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally-insured institution, under 18 USC 1014 by imprisonment of not more than thirty years or a fine of not more than $1,000,000."   **HAYES** certified this statement by placing his initials next to the statement.

37.     **HAYES**'s application was subsequently approved and $12,500 was transferred from Bank 1 to D&L's bank account on June 24, 2020.   The same day, Hayes transferred the full amount of the loan proceeds, $12,500, from the D&L bank account into his own personal savings account.

38.     On or about July 7, 2020, **HAYES** called Maryland Probation for his regularly scheduled reporting.

<u>Fraudulent Second Draw PPP Loan (January 2021)</u>

39.     On or about July 28, 2020, **HAYES** reported to Maryland Probation to sign a notice that his probation was being abated (probation abatement is an end of active supervision of a supervised individual, even though they remain on probation).   **HAYES** stated to a Maryland

Probation official that he thought his probation would be expunged, not abated. **HAYES** was informed that he would continue on probation through February 12, 2021.

40.     On or about January 22, 2021, **HAYES** applied for a second draw PPP loan from Bank 2.   On the application form, **HAYES** claimed that D&L had five employees and a monthly payroll of $9,014.58.

41.     **HAYES** also attached a 2019 IRS Form 941 to the application purporting to show that D&L had 5 employees and an annual payroll of $240,000.   This 2019 IRS Form 941 was fraudulent.   D&L never filed a Form 941 for tax year 2019, or any other tax year.

42.     The fraudulent Form 941 also contained the PTIN number belonging to a professional tax preparer, J.A.   A PTIN (Preparer Tax Identification Number) is a unique number issued by the IRS to professional tax preparers. A PTIN is used as the tax return preparer's identification number. J.A. had previously been hired by **HAYES** to prepare both his individual tax returns and the returns for D&L, but J.A. never prepared any Form 941s for D&L.   Nor did J.A. authorize **HAYES** to use J.A.'s PTIN on the fraudulent 2019 Form 941 **HAYES** submitted to Bank 2.

43.     The PPP loan also required Hayes to "certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under law, including under 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 U.S.C. 645 by imprisonment of not more than two years and/or a fine of not more than $5,000, and, if submitted to a federally insured institution, under 18 U.S.C. 1014 by imprisonment of not more than thirty

years and/or a fine of not more than $1,000,000." **HAYES** placed his initials next to the statement and electronically signed the document on or about February 22, 2021.

44. The PPP loan was subsequently approved, and on or about February 24, 2021, $22,536.00 was deposited into D&L's business account. That same day, **HAYES** transferred $22,500.00 from D&L's business account to his personal savings account.

### Additional Fraudulent PPP Loan Application to Bank 1

45. On or about January 22, 2021, **HAYES** called Bank 1 regarding a second draw PPP loan application he was working on for D&L, seeking technical assistance.

46. From on about January 22, 2021, through on or about March 10, 2021, Bank 1 requested additional supporting documentation from **HAYES** for the loan application. In this time period, **HAYES** submitted the same fraudulent Form 941 to Bank 1 as he had to Bank 2.

47. **HAYES** also submitted a fraudulent Form W-2 to Bank 1 in an attempt to obtain another PPP loan. The fraudulent W-2 purported to show **HAYES** receiving $200,000 income from D&L in 2019. However, **HAYES** left the address for his then-current employer, Company 1, on the fraudulent W-2, rather than the D&L business address. And **HAYES** included Company 1's EIN rather than D&L's EIN on the fraudulent W-2. **HAYES**'s tax records for tax] year 2019 do not indicate any income from D&L. Rather, **HAYES** claimed a net loss of $15,905 from D&L on his 2019 federal taxes.

48. Ultimately, Bank 1 did not extend this second draw PPP loan to **HAYES**.

### First Draw Loan Forgiveness Application

49. On or about October 15, 2021, **HAYES** again forfeited incorporation for D&L.

50. On or about November 4, 2021, **HAYES** applied on behalf of D&L to Bank 1 for PPP loan forgiveness for the first draw loan.

11

51.     **HAYES** stated in the application that D&L had five employees at the time of loan forgiveness and that he had spent the entire loan amount, $12,500, on payroll costs.

52.     **HAYES** also certified that the information in the forgiveness application was "true and correct in all material respects" and that "knowingly making a false statement to obtain forgiveness of an SBA-guaranteed loan is punishable under the law, including 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 U.S.C. 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a Federally insured institution, under 18 U.S.C. 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000."

53.     **HAYES**'s forgiveness application was not approved.

54.     On or about January 22, 2022, **HAYES** received an email from Bank 1 informing him that he had a minimum repayment due on his first draw PPP loan of $293.08.  **HAYES** did not make any payment.

55.     On or about February 1, 2022, **HAYES** applied to become the Chief of Fiscal Services for the Baltimore City Police Department.

56.     On or about February 22, 2022, **HAYES** received an email from Bank 1 informing him that he had a minimum repayment due on his first draw PPP loan of $600.72. **HAYES** did not make any payment.

57.     On or about March 22, 2022, **HAYES** received an email from Bank 1 informing him that he had a minimum repayment due on his first draw PPP loan of $908.36.  **HAYES** did not make any payment.

58.     On or about April 11, 2022, **HAYES** was hired by the Baltimore City Police Department as Chief of Fiscal Services.

59.     On or about April 19, 2022, **HAYES** was terminated as Chief of Fiscal Services.

60.     On or about April 22, 2022, **HAYES** received an email from Bank 1 informing him that he had a minimum repayment due on his first draw PPP loan of $1216.00. **HAYES** did not make any repayment.

## The Charges

61.     On or about the date listed below, in the District of Maryland and elsewhere, the defendant,

### DANA LAMAR ANTONIO HAYES, JR.

for the purpose of executing and attempting to execute the scheme to defraud, did knowingly transmit and cause to be transmitted by means of wire communication, in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, as set forth below:

| COUNT | APPROXIMATE DATE | DESCRIPTION OF WIRE |
|-------|------------------|---------------------|
| 1 | September 10, 2021 | Interstate wire transfer of $5,000 from the SBA, located outside Maryland, to D&L's business bank account x1373, located within Maryland. |
| 2 | September 13. 2021 | Interstate wire transfer of $10,000 from the SBA, located outside Maryland, to D&L's business bank account x1373, located within Maryland. |
| 3 | June 24, 2020 | Interstate wire transfer of $12,500 from Bank 1, located outside Maryland, to D&L's business bank account x1373, located within Maryland. |
| 4 | January 22, 2021 | Interstate wire transmission caused by HAYES in Maryland, submitting Second D&L PPP Loan Application to Bank 2, located outside of Maryland |

| 5 | February 24, 2021 | Interstate wire transfer of $22,536.00 from Bank 2, located outside of Maryland, to D&L's business bank account x1373, located within Maryland. |
|---|---|---|

18 U.S.C. § 1343

## COUNTS SIX AND SEVEN
### (Money Laundering)

The Grand Jury for the District of Maryland further charges that:

### Introduction

1.       The allegations in Paragraphs 1 through 60 of Counts One through Five are incorporated here.

### The Charges

2.       On or about the dates listed below, in the District of Maryland and elsewhere, the defendant,

### DANA LAMAR ANTONIO HAYES, JR.

did knowingly engage and attempt to engage in the following monetary transactions by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, the transfer and withdrawal of funds, as set forth below, such property being derived from a specified unlawful activity, that is, wire fraud, in violation of 18 U.S.C. § 1343:

| COUNT | APPROXIMATE DATE | DESCRIPTION OF MONETARY TRANSACTION |
|---|---|---|
| 6 | June 24, 2020 | Wire transfer from D&L business account x1373 in the amount of $12,500 to **HAYES**'s personal savings account x3400. |
| 7 | February 24, 2021 | Wire transfer from D&L business account x1373 in the amount of $22,500.00 to **HAYES**'s personal savings account x3400. |

18 U.S.C. § 1957

15

## COUNT EIGHT
### (Aggravated Identity Theft)

The Grand Jury for the District of Maryland further charges that:

1. Paragraphs 1 through 60 of Counts One through Five are incorporated here.

2. On or about February 22, 2021, in the District of Maryland, the defendant,

### DANA LAMAR ANTONIO HAYES, JR

did, during and in relation to a felony enumerated in 18 U.S.C. § 1028A(c), knowingly transfer, possess, and use, without lawful authority, a means of identification of another person, knowing that the means of identification belonged to another person, to wit: the defendant used the Preparer Tax Identification Number (PTIN) number of "J.A." on at least one fraudulent document related to wire fraud under §1343, as set forth in Count Four of the Indictment.

18 U.S.C. §§ 1028A(a)(1), (c)(5)
18 U.S.C. § 2

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1.     Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as a part of any sentence in accordance with 18 U.S.C. §§ 981(a)(1)(C) and 982, 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), in the event of the defendant's conviction on any of the offenses alleged in Counts One through Seven of this Indictment.

### Wire Fraud Forfeiture

2.     Upon conviction of any of the offenses alleged in Count One through Five in this Indictment, the defendant,

### DANA LAMAR ANTONIO HAYES, JR.

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), and/or 18 U.S.C. § 982(a)(2)(A), any property constituting, or derived from, proceeds obtained directly or indirectly, as the result of such offenses.

### Money Laundering Forfeiture

3.     Upon conviction of any of the offenses alleged in Counts Six and Seven of this Indictment, the defendant,

### DANA LAMAR ANTONIO HAYES, JR.

shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in such offenses, or any property traceable to such property.

### Property Subject to Forfeiture

4.     The property to be forfeited includes, but is not limited to, a money judgement in the amount of at least $50,036 in U.S. currency.

### Substitute Assets

17

5.     If, as a result of any act or omission of the defendant, any of the property

described above as being subject to forfeiture:

      a.     cannot be located upon the exercise of due diligence;

      b.     has been transferred or sold to, or deposited with, a third person;

      c.     has been placed beyond the jurisdiction of the Court;

      d.     has been substantially diminished in value; or

      e.     has been commingled with other property that cannot be divided without

          difficulty;

the United States shall be entitled to forfeiture of substitute property up to the value of the

forfeitable property described above pursuant to 21 U.S.C. § 853(p), as incorporated by

18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c).

18 U.S.C. § 981(a)(1)(C)
18 U.S.C. § 982(a)(1), (a)(2)(A), and (b)(1)
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)

                            _____
                            Erek L. Barron
                            United States Attorney

A TRUE BILL:

**SIGNATURE REDACTED**

                         Date:   June 23, 2022
_____
Foreperson

18